# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| SHAWNTA ORRIS, as Guardian Ad Litem on behalf of T.L., a Disabled Adult, and on behalf of all others similarly situated, | Case No. 8:24-cv-874-CEH-AEP |
| Plaintiff, | |
| v. | **AMENDED CLASS ACTION COMPLAINT** |
| LEO V. GOVONI, an individual; JOHN W. STAUNTON, an individual; TODD BELISLE, an individual; RICHARD SHONTER, an individual; CAITLIN JANICKI, an individual; TRACEY GREGORY, an individual; MICHELLE DIEBERT, an individual; LAURA DAVIS, an individual; CAROL SCHROEDER, an individual; BOSTON FINANCE GROUP, LLC a Florida, limited liability corporation, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff T.L., a disabled adult, by and through his guardian ad litem, Shawnta Orris, individually and on behalf of all others similarly situated, brings this amended class action complaint ("Complaint") against defendants Leo V. Govoni, John W. Staunton, Todd Belisle, Richard Shonter, Caitlin Janicki, Tracey Gregory, Michelle Diebert, Laura Davis, Carol Schroeder, and Boston Finance Group, LLC

("Defendants"), based upon his counsels' investigation and upon information and belief as to all other matters, Plaintiff alleges as follows.

## **INTRODUCTION**

1.      This action ("Action") seeks to hold the current and former directors ("Directors") and officers ("Officers") of a Florida 501(c)(3) entity known as The Center for Special Needs Trust ("The Center") accountable for their breach of duties, failure of oversight, failure to implement adequate checks and balances and processes and controls, and failure to act, which breaches and failures both allowed and failed to prevent The Center's founder Leo Govoni ("Govoni") from stealing over an eleven-year period, ***$100 million*** from over 1,000 special needs trusts ("SNT") managed by The Center, and from The Center itself.  The $100 million was purportedly paid out as a loan under a line of credit agreement to the Boston Finance Group, LLC ("BFG"), an entity controlled by Govani.

2.      The SNTs victimized by Govoni's scheme were held by The Center for the benefit of, i.e., ***in trust for,*** some of the nation's most vulnerable people; the victims of catastrophic injury who depend on that money for their living expenses.

3.      On February 9, 2024, The Center filed a petition for Chapter 11 bankruptcy in the United States District Court for the Middle District of Florida (Case No. 8:24-bk-00676-RCT) (the "Bankruptcy Action"). The filings in the

Bankruptcy Action reveal that the money is gone leaving Plaintiff and the Class to suffer the consequences.

4.     According to the filings in the Bankruptcy Action, The Center claims to have discovered the $100 million diversion in April 2022, when Govoni's daughter Kaitlin Janicki ("Janicki") resigned from her position with The Center, and left behind "an unsigned letter dated November 11, 2021 from BFG to The Center's Board of Directors ("Board"), seeking to modify the terms of the long-since matured agreement by extending the maturity date and reducing the required interest payment."  However, statements and admissions in the Bankruptcy Action filings show that The Center's Directors and Officers were aware, or should have been aware, of the "agreement" between BFG and The Center for over a decade before it was purportedly discovered in 2022.

5.     Plaintiff and the members of the purported Class had no notice of a diversion of their assets prior to the bankruptcy filing.  They have had their trust funds stolen and are now left without a crucial means of financial support.  Despite the Directors' and Officers' knowledge of the credit agreement with BFG, no reasonable action has been taken to recover the stolen funds on behalf of the SNT beneficiaries, other than what appears to be a written demand to BFG for repayment.

6.     Accordingly, Plaintiff, by and through his guardian ad litem, filed this class action in an effort to hold those responsible accountable for the harm caused to

3

Plaintiff and the Class, and to seek the return of the misappropriated funds.  Plaintiff, on behalf of himself and all others similarly situated, brings this Action against the Defendants seeking money damages for breach of fiduciary duty and negligence.

## THE PARTIES

7.      Plaintiff T.L., a disabled adult, and his legal guardian, Shawnta Orris, are and at all relevant times were individuals and citizens of Omaha, Douglas County, Nebraska.

8.      At all relevant times, Shawnta Orris was and currently is the legal guardian of her father, Plaintiff T.L., a disabled adult.  Shawnta Orris was appointed the court-ordered guardian of her father in 2014.  Shawnta Orris is grantor of a court-approved special needs trust for the benefit of Plaintiff T.L., a disabled adult, established and administered by The Center, which is a not a party to this action on account of its February 2024 bankruptcy filing.

9.      Defendant Govoni was The Center's founder. According to The Center's tax returns filed with the IRS on Form 990, Govoni was The Center's Vice President and Director from at least 2008 through May 20, 2009. Upon information and belief, Defendant Govoni is, and at all relevant times was, a citizen and resident of Pinellas County, Florida.

10.      Defendant John W. Staunton, Esquire ("Staunton") co-founded The Center with Govoni. According to The Center's tax returns, Staunton was The

Center's President and Director starting in 2008 through December 1, 2009, during which time the first improper transfer of $50 million to BFG was made. According to the Bankruptcy Action filings, Staunton had an ownership interest in BFG. Upon information and belief, Staunton is, and at all relevant times was, a citizen and resident of Pinellas County, Florida.

11. Defendant Todd Belisle ("Belisle") became a Director of The Center and Vice President in 2009, the year in which the first improper transfer of $50 million from The Center to BFG purportedly took place. According to The Center's tax returns, Belisle continued to serve on The Center's Board from 2009 through 2018. In 2011 Defendant Belisle became The Center's President. Belisle was no longer listed as a member of the Board on the tax returns after 2018, yet he remained listed as an Officer (President) through 2021.[1] Upon information and belief, however, Belisle remained a Director from 2018 through 2021.

12. Defendant Belisle purportedly signed the Amended Line of Credit Agreement between The Center and BFG, and thus was aware of the transfers. Belisle was President and Director in 2012 when purportedly the second improper transfers of $50 million to BFG took place. Upon information and belief, Belisle is, and at all relevant times was, a citizen and resident of Pinellas County, Florida.

---

[1] As of the filing of this complaint, The Center's 2022 tax returns were not publicly available.

13.     Defendant Richard Shonter ("Shonter") was a Director of The Center from 2009 through 2020, during the entire time-period the improper transfers from The Center to BFG occurred. Upon information and belief, Defendant Shonter was a citizen and resident of Seminole, Florida.

14.     Defendant Caitlin Janicki ("Janicki") served as Vice President and Director of The Center from October 1, 2012 until at least 2018. According to the filings in the Bankruptcy Action, Janicki is Govani's daughter and was placed at The Center by Govoni as a trusted individual in a key position of authority. According to The Center's tax returns, Janicki was no longer listed as a member of the Board after 2018 but remained listed on the tax returns as an Officer (Vice-President) through 2021 (with the 2022 returns unavailable). Upon information and belief, however, Janicki remained a Director from 2018 through at least 2021. Upon information and belief, Defendant Janicki is, and at all relevant times was, a citizen and resident of Clearwater, Florida.

15.     Defendant Tracey Gregory ("Gregory") served as Chief Financial Officer ("CFO"), and Director of The Center from 2015 until at least 2018. According to the Bankruptcy Action filings, Gregory had full access to and control over The Center's bank accounts and financial records. According to The Center's tax returns, Gregory was no longer listed as a member of the Board but remained listed as an Officer (CFO) from 2019 through 2020. Upon information and belief,

however, Gregory remained a Director from 2018 through 2020. Upon information and belief, Defendant Gregory is and at all relevant times was a citizen and resident of Palmetto, Florida.

16.     Defendant Michelle Diebert ("Diebert") was a Director and The Center's President as of the February 9, 2024 bankruptcy filing.  According to The Center's tax returns, Defendant Diebert served as an Officer of The Center (Secretary) from March 1, 2014 through 2021. In 2019 Defendant Diebert continued to serve as an officer (Treasurer), and held that title through at least 2021. Upon information and belief, Defendant Diebert is and at all relevant times was a citizen and resident of Largo, Florida.

17.     Defendant Laura Davis ("Davis") was a Director of The Center from 2021 through the February 9, 2024 bankruptcy filing.  According to the Bankruptcy Action filings, Defendant Davis was an Officer of The Center (Vice-President in 2021). Upon information and belief, Defendant Davis is, and at all relevant times was, a citizen and resident of Riverview, Florida.

18.     Defendant Carl Schroeder ("Schroeder") was a Director and Secretary of The Center as of the February 9, 2024 bankruptcy filing. Upon information and belief, Defendant Schroeder is, and at all relevant times was, a citizen and resident of Palm Harbor, Florida.

7

19.     Defendant BFG is and at all relevant times was a Florida limited liability company with its principal place of business in Pinellas County, Florida.

20.     At all relevant times, Govoni has served as BFG's managing member and, controlled its operations and affairs.  Upon information and belief, at all relevant times Defendant Staunton owned membership interests in BFG and, along with Govoni, controlled its' operations and affairs.

21.     At all relevant times, Defendant BFG has been the alter ego of its control persons, Govoni and Staunton.

## OTHER RELEVANT NON-PARTIES

22.     As trustee for the SNTs, The Center is required to furnish each beneficiary with an accounting showing the receipts, disbursements, and inventory of their SNT at least once annually.  The Center retained the accounting firm Fiduciary Tax & Accounting Services, LLC (FTAS") to provide all required annual trust accounting and tax filing services for each trust. FTAS was paid approximately $650,000 annually for those services.

23.     According to the records filed with the Florida Secretary of State, Govoni formed FTAS.

24.     After its founding, The Center contracted with Austin Colby Co. ("Austin Colby"), which is owned and operated by Govoni, "to handle all of its IT and HR functions."

8

25.    Austin Colby controlled The Center's electronics, computer network, and records including employee access to any electronic systems and records.

26.    Austin Colby controlled The Center's payroll processing and payroll account.

27.    At all relevant times, Austin Colby has been the alter ego of its control person, Govoni.

28.    According to The Center's Bankruptcy Action filings, Govoni's control over Austin Colby allowed him to control hiring and firing and facilitated the placement of individuals beholden to him in key positions.

## JURISDICTION, AND VENUE

29.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000 exclusive of interests and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants.

30.    This Court has personal jurisdiction over Defendants because these Defendants are citizens and residents of Florida.

31.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in this District because a substantial part of the events or omissions giving rise to Plaintiff and Class members' claims occurred in this District.

## FACTUAL BACKGROUND

### The Center's Background

32.     The Center is a 501(c)(3) non-profit Florida corporation that provides trust services for beneficiaries and their representatives related to the formation and administration of SNTs.  The term "Special Needs Trust" encompasses a variety of specialized trusts used for special needs planning, which are often funded from settlements or recoveries from catastrophic personal injury lawsuits.  While the various types of trusts under the SNT umbrella have some key differences, the primary purpose of an SNT is to allow someone who receives means-tested public assistance benefits like Supplemental Security Income ("SSI") and Medicaid to also receive the benefit of distributions from their SNT, such as payment for beneficiary expenses.

33.     The Center's tax returns filed with the IRS on Form 990 state that the Center's "mission" is:

> To offer specialized administrative services for impoverished people with disabilities who have special needs trusts for the purpose of improving their quality of life.

34.     In general, the purpose of an SNT is to allow beneficiaries to receive payments from lawsuit settlements or recoveries through distributions from the SNT while continuing to qualify for and receive means-tested public assistance benefits like Medicaid.

35.     Often, beneficiaries of SNTs are completely and permanently disabled such that apart from public assistance, their only source of income is distributions from the SNT.  This heightened dependency imposes corresponding heightened duties on SNT administrators, including SNT trustees, to safeguard SNT assets for beneficiaries' use and benefit over the course of their lifetimes.

36.     The grantors of the SNTs are typically the guardians of the primary SNT beneficiary, the disabled individual. Two common types of SNTs are formed pursuant to federal law. The first are individual, irrevocable SNTs typically established by order of the court overseeing the beneficiary's personal injury case, in accordance with 42 U.S.C. § 1396p(d)(4)(A). The second are pooled SNTs also typically established by court order, in accordance with 42 U.S.C. § 1396p(d)(4)(C).

37.     With pooled SNTs, after a beneficiary agrees to join in the trust, separate subaccounts are maintained for each beneficiary tracking what assets were contributed to the trust, but trust assets are pooled in a master trust account, which in theory allows for better investment opportunities and lower administrative costs.

38.     Individual irrevocable SNT agreements provide benefits solely to the beneficiary during life, with the remainder going to the beneficiaries' heirs.

39.     With pooled SNTs, benefits are provided to the beneficiaries during their lives. Any trust estate remaining in the beneficiary's pooled SNT sub-account

after the beneficiary's death is deemed surplus trust property and retained by the pooled SNT, not by the beneficiaries' heirs.

40.     Since its founding on December 8, 2000, The Center has grown to be one of the largest administrators of SNTs in the country, with beneficiaries located in almost every state as well as beneficiaries who are located internationally. As of the date of the bankruptcy filing, the Center administered over 2,000 SNTs. While the Center claims to outsource the investment management of the funds held in each SNT, it claims to currently manage over $200,000,000 through pooled and individual SNTs, including amounts owed by BFG, Govoni and affiliated entities.

41.     Plaintiff and Class members are grantors and/or beneficiaries of SNTs ("Beneficiaries") administered by The Center, placed their trust in The Center and its founders, officers, directors, and agents to administer the SNTs loyally, prudently, and in good faith.

42.     Govoni, with the assistance of his business colleague and attorney Staunton, a Pinellas County-based trusts and estates lawyer, founded and incorporated The Center in 2000, and served on its Board until his resignation in 2008 or early 2009.

43.     The Center created individual SNT agreements and retained the services of a law firm owned by Staunton to draft those agreements and represent The Center in negotiating with and the pooled SNT at the beneficiaries' death.

## **Control of the Center**

44.     According to The Center's filings in the Bankruptcy Action, Govoni, for all practical purposes, controlled The Center's activities and operations for 20 years,

45.     Govoni served on The Center's Board from its founding until his resignation in 2008 or early 2009.

46.     Govoni resigned from the Board shortly before the first improper transfer to BFG of $50 million in 2009.

47.     Following his resignation, The Center contends that Govoni continued to control and exert influence over The Center's operations and finances.

48.     According to the Bankruptcy Action filings, Govoni's control over The Center's finances took two primary forms: (i) employees of The Center would knowingly or unknowingly assisted Govoni in transferring funds from the Center to BFG; and (ii) control of outside entities that were responsible for key aspects of The Center's operations and financial reporting.

49.     To accomplish the transfer of funds, Govoni relied on Defendant Gregory, an employee of BFG, but a portion of whose salary was paid by The Center. Gregory worked at The Center from 2008 until her resignation in 2020. During that time, she was a Board member and The Center's accounting manager. Gregory purportedly had full access and control over The Center's bank accounts and

financial records. According to the Bankruptcy Action filings, Gregory, presumably at the direction of Govoni, allowed the $100 million to be transferred to BFG.

50.   According to the Bankruptcy Action filings, Govoni was able to prevent beneficiaries from becoming aware of the $100 million transfer and ensuing default by exercising control over the information and financial disclosures the beneficiaries received. As trustee for the SNTs, The Center is required to furnish each beneficiary with an accounting showing the receipts, disbursements, and inventory of their SNT at least once annually. The Center retained the accounting firm FTAS to provide all required annual trust accounting and tax filing services for each trust. FTAS was paid approximately $650,000 annually for those services.

51.   While The Center claims to have later learned that Govoni owns FTAS, the Bankruptcy Action filings acknowledge that the records filed with the Florida Secretary of State show that Govoni formed FTAS. The Bankruptcy Action filings further state "it is believed that Govoni formed FTAS. . . to prepare the required trust accountings specifically to ensure that Govoni could control the financial disclosures to The Center's beneficiaries and to further monetize his relationship with The Center."

52.   Govoni further purportedly controlled the company "The Center hired and relied on for its IT and HR needs. After its founding, The Center contracted with

Austin Colby, which is owned and operated by Govoni "to handle all of its IT and HR functions."

53.     According to the Bankruptcy Action filings, Austin Colby controlled The Center's electronics, computer network, and records including employee access to any electronic systems and records, and Austin Colby controlled the Center's payroll processing and payroll account.

54.     According to The Center's Bankruptcy Action filings, this allowed Govoni to control hiring and firing and facilitated the placement of trusted individuals in key positions including Gregory—Board member and accounting manager--and Govoni's daughter Caitlin Janicki, former head of case management and vice president of The Center.

**The Improper Transfers**

**The First $50 Million in 2009**

55.     The first improper transfer of $50 million to BFG occurred in or around 2009.

56.     In the Bankruptcy Action filings, The Center acknowledges a letter from BFG to the Center dated August 31, 2011, that referenced loan documents for the improper transfers.  Based on that letter, The Center determined that that the $50 million was purportedly a loan.

57.    While The Center claims to not have copies of loan documents evidencing a loan or line of credit authorized by the Board or any other party at the Center, the *Bankruptcy Action filings do not claim that the Center **did not have the letter** referenced above referencing those loan documents*.

## The Second $50 Million in 2012

58.    Starting around January 1, 2012, an additional $50 million was purportedly transferred to BFG in the form of draws.

59.    According to the Bankruptcy Action filings, "to document these transfers, Govoni had BFG execute an Amended and Restated Promissory Note in favor of the Center in the amount of $100 million and an Amended and Restated Revolving Line of Credit."

60.    Govoni purportedly executed the documents on behalf of BFG.

61.    According to the Bankruptcy Action filings, "[t]he Line of Credit Agreement purports to have been executed by Defendant Belisle on behalf of The Center. At the time, Mr. Belise was an employee, Officer (the President), and a member of The Center's Board of Directors. He remains an employee of the Center as of the bankruptcy filing date. Mr. Belisle, however, claims to have no recollection of signing the Note or Line of Credit Agreement or of the Board of Directors authorizing a $100 million loan to BFG."

62.     Defendant Belisle was a long-time Officer and Director of The Center, starting as Vice President and director in 2009 and becoming President from 2010 through 2021.  The Bankruptcy Action filings do not dispute that Mr. Belisle signed the Amended Line of Credit Agreement in his capacity as an Officer and Director of The Center, presumably at or around January 1, 2012.

**Additional Advances**

63.     The Note and Credit Agreement matured on January 1, 2017, but was not repaid.  "Instead, BFG continued to receive advances from The Center and SNTs until late 2020."

**Purported Discovery of the "Loan"**

64.     According to the Bankruptcy Action filings, when Janicki resigned from The Center in April 2022, she left behind an unsigned letter to the Board dated November 11, 2021 seeking to extend the maturity date of the long-since matured Note. While The Center asserts that the discovery of the letter revealed the existence of the Line of Credit Agreement, The Center does not dispute that it received the August 31, 2011 letter from BFG that references loan documents over ten years earlier, nor does it dispute that Defendant Belisle signed the Line of Credit Agreement on behalf of The Center presumably at or around January 1, 2012.

**Red Flags and/or Indicia of Knowledge**

65.     As set forth above, the August 31, 2011 letter from BFG referencing loan documents, and the apparent fact that Defendant Belisle signed the Amended Line of Credit Agreement on behalf of The Center to document the 2009 and January 1, 2012 $100 million transfers, clearly demonstrate knowledge of the credit agreement with BFG at least as of August 2011. The Bankruptcy Action filings do not reveal the date Mr. Belisle signed the Amended Agreement, but it is a reasonable inference it was no later than January 1, 2012, around the time the second $50 million improper transfer was made. Thus, it is reasonable to infer that The Center knew or should have known of the Agreement and that money was being misappropriated no later than 2011.

66.     There are numerous other red flags indicating that The Center knew or should have known of a credit agreement with BFG. For example:

67.     Each of The Center's tax returns filed with the IRS of Form 990 for the tax years 2017 through 2020, represent on their face that The Center's "[t]he books are in care of Todd Belisle".

68.     The above representation in The Center's official tax returns filed with the IRS contradict the Bankruptcy Action filings which state that The Center's books were in the sole control of Austin Colby, owned and controlled by Govoni.

18

69.     In addition, the Bankruptcy Action filings reveal that "BFG continued to receive advances from The Center and SNTs until late 2020."  Thus, had The Center's Officers and Directors reviewed The Center's financial statements as they were duty-bound to do, a reasonably prudent Officer or Director should have discharged their duty of inquiry and questioned where the outflow of money was going and why, and thus would have learned of the BFG Line of Credit Agreement.

70.     Further, the Bankruptcy Action filings reveal that "Although periodic interest payments and what was alleged to be a small principal reduction have been made to the center, neither BFG nor Govoni have made any meaningful attempt to repay the $100 million."

71.     Had The Center's Officers and Directors reviewed The Center's financial statements as they were duty-bound to do, a reasonably prudent Officer or Director should have discharged their duty of inquiry and questioned the source of periodic interest payments and repayment of principal from BFG, and thus would have learned of the BFG Line of Credit Agreement.

72.     Finally, The Center's sole function is a trust company holding trust funds for seriously injured individuals, a reasonably prudent Officer or Director should have reviewed the balances in the trust accounts on an ongoing basis, which should have put them on notice that trust money was missing.

**The Officers' and Directors' Failure to Act**

73.     Until filing the Bankruptcy Action in February 2024, The Center gave no notice to the SNT Beneficiaries of the existence of The Center's "loans" to BFG or BFG's defaults on those "loans," with apparently no reasonable action having being taken to sue BFG, Govoni, Staunton, or any other individual or entity involved in the misappropriation of SNT assets for which The Center is the trustee.

74.     The Bankruptcy Action filings represent that despite 1) admitting the existence of a letter dated August 31, 2011 from BFG to The Center referencing loan documents for the purported "loans" to BFG, and 2) admitting the existence of an Amended and Restated Promissory Note in favor of The Center in the amount of $100 million, and an Amended and Restated Revolving Line of Credit Agreement executed by Govani on behalf of BFG, and The Center's President and Board Member Belisle to document the 2009 and January 1, 2012 $100 million transfers, The Center waited until August 8, 2023, to have a lawyer send a demand letter to BFG and Govoni to request access to BFG's books and records pursuant to the Line of Credit Agreement, and for documents regarding how BFG used the "loan" proceeds. The letter was ignored. A month later, on September 8, 2023, a lawyer for the first time sent a demand letter for repayment of the $100 million, which was also ignored and apparently no legal action was taken to compel "loan" repayment.

75.     The Center now blames everyone but itself and its current and former Directors and Officers for the massive, unmitigated misappropriation of SNT assets. The Bankruptcy Action filings state that there are 1,570 compromised trusts, whose Beneficiaries are the Plaintiff and Class Members in this Action.

76.     Following The Center's purported first learning of the BFG loan in April 2022, The Center filed suit against Austin Colby in a Florida state court in June 2022, alleging The Center's access to its servers and data had been cutoff and requesting injunctive relief.  After Austin Colby asserted counterclaims, the parties entered into an October 2022 settlement, the terms of which The Center has made public in the Bankruptcy Action filings.  The Center agreed to pay $12,500.00 to Austin Colby, in exchange for access to electronically stored information, including The Center's employee email accounts, which The Center now alleges was never completely provided by Austin Colby in breach of the settlement; the transfer of The Center's telephone numbers and website URLs; and the transfer of Austin Colby's personal property, including what is generically described as Govoni's personal property and a safe he owned.  Despite being aware of who owned and controlled Austun Colby, The Center released Austin Colby and each of its shareholders, officers, directors, members, managers, general or limited partners, parent, subsidiary or affiliated entities, insurers, attorneys, employees, servants, agents, heirs, successors and assigns, of and from any claims, demands, damages, obligation,

liability or responsibility of any kind whatsoever arising out  of or related to that litigation and the claims brought therein.

### Plaintiff's Experience

77.     In 2012, Plaintiff T.L. filed a suit in the District Court of Douglas County, Nebraska, captioned *[TL] v. Pitney Bowes Presort Services,* Case No. 12-1833 against defendant Pitney Bowes Presort Services ("Pitney Bowes").

78.     On or about December 18, 2009, a semi-tractor trailer owned by Pitney Bowes backed into the side of Plaintiff T.L.'s vehicle as he was traveling south on 16th Street in Omaha, Nebraska. As a result of the accident, Plaintiff T.L. required a single level fusion of the L4-5 and decompression of L5-S1. Plaintiff T.L. underwent spine surgery related to his accident on March 27, 2012.

79.     Plaintiff T.L. suffered a stroke during the course of, or immediately following, the March 27, 2021 surgery which was causally linked to his motor vehicle accident on December 18, 2009.  Approximately 17 months after the initial stroke, on October 20, 2013, Plaintiff T.L. suffered a second, more debilitating stroke caused by blood thinners prescribed after the March 27, 2021 surgery. On October 1, 2014, the County Court of Douglas County, Nebraska found Plaintiff T.L. to be mentally and physically incapacitated and appointed Plaintiff T.L.'s daughter, Shawnta Orris, as his Guardian and Conservator.

80.     As the action against Pitney Bowes was approaching trial, a confidential, mediated settlement was reached in March 2016. In connection with that settlement, a designated amount of the settlement proceeds was allocated to future medical care.

81.     On March 24, 2016, Plaintiff T.L., as Settlor, executed the Irrevocable Declaration of Trust, with The Center signing that agreement as the Trustee, to manage and oversee the settlement proceeds as the trust's fiduciary.

82.     Also in March 2016, Plaintiff T.L.'s daughter, Shawnta Orris, as Guardian and Conservator of Plaintiff T.L., petitioned the County Court of Douglas County Nebraska August 2011 to approve the establishment of an irrevocable Special Needs Trust for the sole benefit of T.L., by and between The Center, on one hand, and Shawnta Orris, as T.L.'s Guardian and Conservator.

83.     On April 4, 2016, the County Court of Douglas County Nebraska approved the confidential settlement and granted Ms. Orris authority to settle the matter as Guardian and Conservator.  Also on April 4, 2016, the Court approved the establishment of the Special Needs Trust.

## CLASS ACTION ALLEGATIONS

84.     Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiff brings this action on behalf of himself and on behalf of all members of the proposed nationwide Class (the "Class") defined as:

> All individuals residing in the United States who are grantors and/or beneficiaries of pooled SNTs administered by the Center, as the trustee of those SNTs, and affected by monetary transfers to BFG out of one or more SNT trust accounts.

85.     Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

86.     Plaintiff reserves the right to amend the definition of the Class or add a Class or sub-class if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

87.     Numerosity: The Class members are so numerous that joinder of all members is impracticable, if not completely impossible. At least 1,570 SNTs were and are compromised due to the transfers to BFG resulting from Defendants' conduct.  The Class is identifiable vis The Center's records, and The Center has already identified these individuals (as evidenced by sending them Notice Letters in the Center Bankruptcy Case).

88.     Common questions of law and fact exist as to all Class members and predominate over any questions affecting solely individual Class Members. Among

the questions of law and fact common to the Class that predominate over questions

which may affect individual Class members, are the following:

  a. Whether and to what extent each Defendant had a respective duty to detect, investigate, and inquire into the diversion of pooled SNT assets;

  b. Whether and to what extent each Defendant had a respective legal and/or fiduciary duty to prevent pooled SNT assets from being misappropriated and diverted;

  c. Whether and to what extent each Defendant had a respective legal and/or fiduciary duty to promptly notify Class members when the misappropriation and diversion of SNT assets was discovered;

  d. Whether and to what extent each Defendant owed Class members a respective legal and/or fiduciary duty to inquire into, detect, prevent, not engage in, and/or warn about the diversion of pooled SNT assets to BFG;

  e. Whether each Defendant's acts to detect, investigate, and inquire into the diversion and misappropriation of SNT assets were reasonable in light of evidence that such diversion and misappropriation was taking place;

  f. Whether each Defendant's acts or omissions to prevent the ongoing diversion and misappropriation of SNT assets were reasonable in light of evidence that such diversion and misappropriation was taking place;

  h. Whether each Defendant acts or omissions to promptly notify Class members upon discovering the misappropriation diversion of SNT assets to BFG were reasonable in light of confirmation that such misappropriation and diversion was taking place;

i.   Whether each Defendant's failure to detect, investigate, or inquire into the ongoing diversion and misappropriation of SNT assets amounted to negligence;

j.   Whether each Defendant's failure to take reasonable steps to prevent the ongoing diversion and misappropriation of SNT assets amounted to negligence;

k.   Whether each Defendant's failure to detect, investigate, or inquire into the ongoing diversion and misappropriation of SNT assets amounted to a breach of fiduciary duty;

l.   Whether each Defendant's failure to prevent the ongoing diversion and misappropriation of SNT assets amounted to a breach of fiduciary duty; and

m.  Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct.

89.   Typicality: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, was exposed to virtually identical conduct and now suffers from the same injuries as each other member of the Class, i.e., the diversion and misappropriation of pooled SNT assets.

90.   This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making uniform declaratory relief appropriate as to the Class as a whole.  Defendants' acts and omissions challenged herein apply to and affect Class members uniformly and Plaintiff's

claims hinge on issues related to Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff:

    a. Whether Govoni, and Staunton used BFG as a mere instrumentality, such that it is an alter egos of Govoni, Golden, and Staunton;

    b. Whether each Defendant owed a legal and/or fiduciary duty to Plaintiff and the Class to exercise due care to detect, investigate, and inquire into the diversion and misappropriation of SNT assets; and

    c. Whether each Defendant owed a legal and/or fiduciary duty to Plaintiff and the Class to exercise due care to prevent the diversion and misappropriation of SNT assets.

91.    Adequacy: Plaintiff will fairly and adequately represent and protect the interests of Class members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class members.  Plaintiff seeks no relief that is antagonistic or adverse to Class members and the infringement of the rights and the damages he has suffered are typical of other Class members.  Plaintiff has retained counsel experienced in complex class action and asset recovery litigation, and Plaintiff intends to prosecute this action vigorously.

92.    Superiority: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved.  Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of evidence, effort, and expense that millions of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class members, who could not individually afford to litigate a complex claim against large corporations like Defendants. Further, even for those Class members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

93.    The nature of this action and the nature of laws available to Plaintiff and Class members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage, as they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

94.    Adequate notice can be given to Class members directly using information maintained in the Center's records, which Plaintiff will seek and obtain through discovery.

95.    Further, Defendants have acted and/or failed to act on grounds that apply generally to the Class as a whole, so that class certification and corresponding declaratory relief are appropriate on a class-wide basis.

## CLAIMS

### COUNT I: BREACH OF FIDUCIARY DUTY
**Against Defendants Govani, Staunton, Belisle, Shonter, Janicki,
Gregory, Diebert, Davis and Schroeder**

96.    Plaintiff re-alleges and incorporates paragraphs 1 through 95 above as though set forth fully herein.

97.    At all relevant times, defendants Govani, Staunton, Belisle, Shonter, Janicki, Gregory, Diebert, Davis, and Schrorder acted in the course and scope of their roles as Directors or Officers of The Center.

98.    At all relevant times, as Beneficiaries of the SNTs, Plaintiff and Class members reposed trust in defendants to exercise their oversight and diligence in the handling and investing SNT funds.

99.    By virtue of the imbalance of superiority and vulnerability in defendants' relationship with Plaintiff and Class members, these defendants had a special relationship with Plaintiff and the Class members giving rise to their

heightened, strict, fiduciary duties of care, loyalty, and prudence owed to Plaintiff and Class members.

100.   By virtue of their fiduciary relationship to Plaintiff and Class members, at all relevant times, these defendants owed Plaintiff and Class members strict fiduciary duties of loyalty, prudency, and good faith.

101.   As the fiduciaries entrusted to handle and invest SNT assets, these defendants owed Plaintiff and Class members the fiduciary duties to administer and invest the SNTs prudently and reasonably.

102.   At all relevant times, these defendants knew that their special, fiduciary relationship to Plaintiff and Class members gave rise to their heightened, strict, fiduciary duties of care, loyalty, and prudence in handling and investing SNT funds.

103.   These defendants breached their duties of care, loyalty, and prudence, owed to Plaintiff and Class members by permitting an over $100 million diversion of money in Plaintiff and Class members' SNT accounts with no legitimate, reasonable, or prudent purpose.

104.   These defendants breached their duties of care, loyalty, and prudence, owed to Plaintiff and Class members by permitting the transfer of over $100 million from SNT accounts to one or more BFG accounts for the purported BFG loan, which was never a reasonable investment, authorized, or repaid to the SNTs.

105.   These defendants further breached their fiduciary duties of care, loyalty, and prudence by permitting the depletion of the SNT accounts for the improper transfers to BFG, with no prudent or legitimate reason for doing so.

106.   The members of the current Board, Defendants Diebert, Davis and Schroeder, breached their fiduciary duties to Plaintiff and Class members by failing to act under circumstances which would require them to act to protect the assets held in trust for Plaintiff and the Class.

107.   But for these defendants' breaches of its fiduciary duties owed to Plaintiff and Class members as described above, the decade-long scheme would never have occurred.

108.   As a direct and proximate result of these defendants' breaches of fiduciary duties owed to Plaintiff, Plaintiff and Class members have been injured, including by the conversion, dissipation, and waste of over $100 million in SNT assets, damages for which these Defendants are jointly and severally liable.

## <u>COUNT II: NEGLIGENCE</u>
### Against Defendants Govani, Staunton, Belisle, Shonter, Janicki, Gregory, Diebert, Davis and Schroeder

109.   Plaintiff re-alleges and incorporates paragraphs 1 through 95 above as though set forth fully herein.

110.   At all relevant times, defendants Govani, Staunton, Belisle, Shonter, Janicki, Gregory, Diebert, Davis, and Schrorder, as Directors and Officers of The

31

Center, owed Plaintiff and Class members as SNT Beneficiaries the duty to act reasonably with respect to the SNT assets The Center handled, and defendants oversaw.

111.    These defendants' duties of care owed to Plaintiff and Class members required them to ensure that SNT account funds were not being used or invested in transactions that constitute self-dealing or put the SNT property at risk.

112.    These defendants' duties of care owed to Plaintiff and Class members further required them to account for SNT account funds with the level of diligence required to accurately inform Beneficiaries and prevent SNT property from being wasted, misappropriated, or used in self-dealing transactions.

113.    These defendants' duties of care owed to Plaintiff and Class members further required them to notify Beneficiaries promptly upon discovering any fraud, conversion, or other harmful transaction related to Beneficiaries' SNTs.

114.    These defendants knew or should have known that the transfer of over $100 million from the Plaintiff's SNT accounts to BFG for the sham BFG loan would harm the SNTs and injure Plaintiff.

115.    These defendants knew or should have known that by delaying disclosure or notification to Beneficiaries that the SNT funds had been converted to BFG's wrongful use, they would cause Plaintiff and Class members to take

appropriate measures for the (now very real) possibility that their SNT accounts are compromised.

116.   Defendants breached their duties of care owed to Plaintiff and Class members and were negligent by the following acts and/or omissions, among others:

    a.   Allowing and/or causing SNT account funds to be converted, misappropriated, and wasted;

    b.   Failing to notify Plaintiff and Class members of the depletion of their SNT accounts during the decade-long period such conduct took place; and

    c.   Failing to act under circumstances which would require them to act to protect the assets held in trust for Plaintiff and the members of the Class.

117.   These defendants' negligent acts and omissions described herein were the direct and proximate cause of and/or a substantial contributing factor in Plaintiff's and Class members' injuries and resulting damages.

118.   But for these defendants' negligent acts and omissions described herein, BFG's misappropriation and conversion of SNT assets would have been discovered promptly, and the $100,000,000 in stolen funds would have remained segregated and preserved in SNT accounts.

119.   As the direct and proximate result of these defendants' negligent breaches of their duties of care as described herein, Plaintiff and Class members suffered damages including the depletion of over $100,000,000 in SNT assets that

occurred over a ten-year period without Plaintiff's and Class members' knowledge or consent, damages for which these defendants are jointly and severally liable.

## COUNT III: CONVERSION
### Against Defendant BFG

120.    Plaintiff re-alleges and incorporates paragraphs 1 through 95 above as though set forth fully herein.

121.    At all relevant times, defendant BFG knew that the SNT property belonged to the beneficiaries -- Plaintiff and the members of the Class.

122.    At all relevant times, defendant BFG knew that the beneficiaries did not authorize the transfer of SNT funds to BFG.

123.    At all relevant times, Plaintiff and the members of the Class had an immediate and exclusive right to the funds that were improperly transferred to BFG from the SNT accounts.

124.    Defendant BFG converted the SNT funds to which Plaintiff and the members of the Class had an immediate and exclusive right by transferring or causing to transfer the SNT funds out of the SNT accounts to BFG.

125.    Defendant BFG had no interest in or right to the SNT funds that would permit it to transfer or possess them.

126.    Defendant BFG has been demanded to return the funds to the SNTs but have refused to do so.

127.    As a direct consequence of defendant BFG's wrongful conversion of the SNT funds belonging to Plaintiff and the members of the Class, Plaintiff and the members of the Class have been deprived of their SNT funds and suffered corresponding damages for which this defendant is jointly and severally liable.

## COUNT IV: UNJUST ENRICHMENT
### Against Defendant BFG

128.    Plaintiff re-alleges and incorporates paragraphs 1 through 95 above as though set forth fully herein.

129.    This count is pled in the alternative.

130.    Plaintiff and the members of the Class conferred a monetary benefit on defendant BFG by providing $100 million to BFG from the SNT accounts.

131.    In exchange, Plaintiff and Class members should have received a benefit to their SNTs or similar return on their investment.

132.    BFG knew that Plaintiff and Class members conferred, and BFG retained a benefit in the form of funds siphoned from the SNTs and transferred to BFG.

133.    BFG acquired the SNT assets through inequitable means in that BFG concealed the transfers to BFG and obtained the money from the pooled SNT accounts.

134.     Defendant BFG enriched itself by siphoning $100,000,000 from pooled SNT accounts meant to provide for often-vulnerable disabled and elderly individuals.

135.     Under principles of equity and good conscience, BFG should not be allowed to retain the $100 million wrongfully misappropriated and converted from Plaintiff's and Class members' SNTs.

136.     Plaintiff and Class members have no adequate remedy at law.

137.     As a direct and proximate result of BFG's conduct, Plaintiff and members of the Class have suffered and will continue to suffer other forms of injury and/or harm.

138.     BFG should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and members of the Class, proceeds that BFG unjustly received from them.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, requests judgment against Defendants and that the Court grants the following:

A.     For an order certifying the Class, as defined herein, and appointing Plaintiff and his Counsel to represent the Class;

B.     For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined by a jury at trial;

C.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

D.     For prejudgment interest on all amounts awarded; and

E.     Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: April 25, 2024          Respectfully submitted.

**STEINLAW FLORIDA, PLLC**
By: */s/ Jonathan M. Stein*
Jonathan M. Stein (Fla. Bar No. 9784)
1825 NW Corporate Blvd., Suite 110
Boca Raton, FL 33431
(561) 834-2699
jon@SteinLawFlorida.com

Alan L. Rosca
**ROSCA SCARLATO LLC**
2000 Auburn Drive- Suite 200
Beachwood, OH 44122
216-946-7070
arosca@rscounsel.law

Paul J. Scarlato PA 47155
**ROSCA SCARLATO LLC**
161 Washington Street-Suite 1025
Conshohocken, PA 19428
216-946-7070
pscarlato@escounsel.law

J. Barton Goplerud
Brian O. Marty
**SHINDLER ANDERSON**
**GOPLERUD & WEESE P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265-5749
Telephone: (515) 223-4567
Facsimile: (515) 223-8887
goplerud@sagwlaw.com
marty@sagwlaw.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of April 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

**STEINLAW FLORIDA, PLLC**

By: */s/ Jonathan M. Stein*
Jonathan M. Stein (Fla. Bar No. 9784)
1825 NW Corporate Blvd., Suite 110
Boca Raton, FL 33431
 (561) 834-2699
Jon@SteinLawFlorida.com